Filed 7/15/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PERRIE THOMPSON,<br><br>    Defendant and Appellant. | B333097<br><br>(Los Angeles County<br>Super. Ct. No. BA305789) |

    APPEAL from an order of the Superior Court of
Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed.
    Richard Lennon and Sydney Banach, under appointments
by the Court of Appeal, for Defendant and Appellant.
    Jonathan Grossman and Mi Kim for Pacific Juvenile
Defender Center as Amicus Curiae on behalf of Defendant and
Appellant.
    Rob Bonta, Attorney General, Lance E. Winters, Chief
Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Noah P. Hill and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

Perrie Thompson was sentenced to 50 years to life for a homicide he committed when he was 17 years old.  Fifteen years later, he unsuccessfully petitioned the trial court for relief pursuant to Penal Code section 1170, subdivision (d)(1) (section 1170(d)),[1] which authorizes juvenile offenders sentenced to life without the possibility of parole (life without parole or LWOP) to petition for the recall of their sentences and resentencing.

Thompson argues his 50-years-to-life sentence was the functional equivalent of life without parole and, pursuant to *People v. Contreras* (2018) 4 Cal.5th 349 (*Contreras*) and *People v. Heard* (2022) 83 Cal.App.5th 608 (*Heard*), the trial court was required to consider his section 1170(d) petition on the merits.

We affirm the trial court order.  By invoking the reasoning in *Heard*, Thompson asserts equal protection claims.  Although he relies heavily on Eighth Amendment precedent, we conclude his arguments require an equal protection analysis.  Thompson fails to demonstrate that the life without parole limitation on eligibility for section 1170(d) relief is irrational, and therefore unconstitutional, as applied to him, a juvenile homicide offender who was sentenced to 50 years to life.

**FACTUAL AND PROCEDURAL BACKGROUND**

In 2005, Thompson shot and killed Ayboni Del Toro.  Immediately before shooting, Thompson issued a gang challenge

---

[1]     All further undesignated statutory references are to the Penal Code.

to Del Toro and another man.  Thompson was 17 years old at the time.  A jury convicted Thompson of first degree murder (§ 187, subd. (a)) and found true personal gun use and gang allegations (§§ 12022.53, subds. (c) & (d), 186.22, subd. (b)(1)(A)).  In 2007, the trial court sentenced Thompson to 50 years to life in prison.

In 2023, Thompson petitioned for recall and resentencing pursuant to section 1170(d).  Thompson argued that, under *Contreras*, his sentence was the functional equivalent of life without parole and, like the petitioner in *Heard*, he was therefore eligible for section 1170(d) relief.  He provided evidence of commendations he has received while incarcerated, letters of remorse, and proof of his completion of numerous educational, vocational, and self-help programs.

The trial court denied the petition.  The court reasoned that Thompson's sentence of 50 years to life is not functionally equivalent to life without parole since he will be eligible for parole "well within his life expectancy" and has a meaningful opportunity to be released.

Thompson appealed.  The Attorney General initially opposed the appeal, arguing Thompson's 50-years-to-life sentence is not the functional equivalent of life without parole.  The Attorney General further asserted that excluding Thompson from section 1170(d) eligibility did not violate his right to equal protection.  He argued there were several rational bases justifying the Legislature's decision to provide section 1170(d) relief only to juvenile offenders sentenced to "actual" life without parole.

However, the Attorney General subsequently withdrew his arguments and now concedes that a juvenile offender's sentence of 50 years to life is the functional equivalent of life without

parole. The Attorney General further concedes that denying relief to that category of juvenile offenders violates equal protection guarantees.

Thompson asks this court to hold that a duly enacted statute violates his constitutional rights to equal protection if applied as written. He further asks us to expand the reach of that statute to a group of offenders the Legislature did not include in its scope. (*Heard, supra*, 83 Cal.App.5th at p. 626.) In our view, we must independently address the merits of Thompson's arguments, which are questions of law, irrespective of the Attorney General's concession. (See *Perry v. Brown* (2011) 52 Cal.4th 1116, 1155 [the validity or proper interpretation of a challenged state statute is ultimately a matter to be determined by the courts, not the Attorney General]; *Sellers v. Superior Court* (2024) 104 Cal.App.5th 468, 478, fn. 4 [court is not bound to accept a party's concession on a question of law], review granted Dec. 18, 2024, S287164, citing *People v. Alvarado* (1982) 133 Cal.App.3d 1003, 1021; cf. *People v. Cabrera* (2025) 111 Cal.App.5th 650.)

## DISCUSSION

### I. United States Supreme Court Precedent, California Supreme Court Precedent, and California Legislation

As many prior courts have observed, the punishment of juvenile offenders has changed significantly over the past 20 years, based on "developments in scientific research on adolescent brain development confirming that children are different from adults in ways that are critical to identifying age-appropriate sentences." (*O.G. v. Superior Court* (2021) 11 Cal.5th 82, 88.) In 2005, the United States Supreme Court held in *Roper*

4

*v. Simmons* (2005) 543 U.S. 551 (*Roper*), that imposing the death penalty on juvenile offenders violates the Eighth Amendment prohibition against cruel and unusual punishment.  In 2010, in *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), the high court held that the Eighth Amendment also prohibits the imposition of a life without parole sentence on a juvenile offender under 18 for a nonhomicide crime.  In June 2012, the high court held in *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*), that the Eighth Amendment prohibits any sentencing scheme that imposes mandatory life without parole sentences on juvenile homicide offenders under 18.  The *Roper*, *Graham*, and *Miller* holdings were based on an evolving understanding that juveniles are less culpable than adults, and more capable of reform and rehabilitation.

In August 2012, the California Supreme Court issued *People v. Caballero* (2012) 55 Cal.4th 262, 268 (*Caballero*), holding that "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment."  The court reasoned that, to comply with *Graham*, the state may not deprive such juveniles "at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future."  (*Ibid.*)

In August 2012, the California Legislature passed Senate Bill No. 9 (2011–2012 Reg. Sess.) (Senate Bill No. 9), later signed into law and codified in September 2012 as Penal Code section 1170, subdivision (d)(2) et seq.[2]  Under what is now

---

[2]     Section 1170, subdivision (d)(2), was later renumbered.  We generally refer to the relevant provisions as section 1170(d).

section 1170(d)(1)(A), "When a defendant who was under 18 years of age at the time of the commission of the offense for which the defendant was sentenced to imprisonment for life without the possibility of parole has been incarcerated for at least 15 years, the defendant may submit to the sentencing court a petition for recall and resentencing."  The petition must describe the petitioner's "remorse and work towards rehabilitation" and include a statement attesting to one of several mitigating circumstances, such as that the petitioner committed the offense with an adult codefendant, or has performed acts while incarcerated suggesting a potential for rehabilitation.  (§ 1170, subd. (d)(2)(A)–(D).)  If the court finds by a preponderance of the evidence that one or more of the statements is true, the court must recall the sentence and hold a hearing "to resentence the defendant in the same manner as if the defendant had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence."  (§ 1170, subd. (d)(5).)

In 2013, the Legislature enacted section 3051, "to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with" *Caballero*, *Graham*, and *Miller*.  (Stats. 2013, ch. 312, § 1.) Section 3051 authorized youth offender parole hearings that would take place, at the latest, in the offender's 25th year of incarceration.  (§ 3051, subd. (b)(1)–(3); Stats. 2013, ch. 312, § 4.) As originally enacted, section 3051 applied only to offenders who were under 18 at the time of their crimes.  It excluded offenders

6

who were sentenced to life without parole. (Stats. 2013, ch. 312, § 4; see *People v. Hardin* (2024) 15 Cal.5th 834, 845 (*Hardin*).)

In 2014, in *People v. Gutierrez* (2014) 58 Cal.4th 1354, the California Supreme Court suggested that the section 1170(d) provisions for recall and resentencing did not solve *Graham* or *Miller* problems in a juvenile homicide offender's life without parole sentence. (*Gutierrez*, at pp. 1385, 1386.)

Two years later, the court issued *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*), which concerned a juvenile homicide offender sentenced to 50 years to life under a mandatory sentencing scheme. (*Id.* at p. 268.) The court held that, like *Graham*, *Miller* applies to sentences that are the functional equivalent of life without parole. (*Id.* at p. 276.) However, the court also concluded that section 3051 reformed Franklin's sentence, provided him a meaningful opportunity for release during the 25th year of his sentence, and rendered his Eighth Amendment argument moot. (*Franklin*, at p. 277.) Franklin was "not serving an LWOP sentence or its functional equivalent." (*Id.* at p. 282; see *id.* at p. 281 [distinguishing *Gutierrez*].)

In 2017, the court held in *In re Kirchner* (2017) 2 Cal.5th 1040 (*Kirchner*), that section 1170(d) does not provide an adequate remedy for addressing *Miller* error. The court explained that "as a process designed to revisit *lawful* sentences of life without parole," and introduced in the Legislature before *Miller*, "section 1170(d)(2) limits the availability of resentencing under its terms, and the resentencing inquiry it prescribes does not necessarily account for the full array of *Miller* factors in the manner that a proper resentencing under *Miller* would." (*Kirchner*, at p. 1043; see *id.* at pp. 1052–1053.)

Effective January 1, 2018, the Legislature amended section 3051 to extend youth offender parole hearings to juveniles sentenced to life without parole, and to certain youthful offenders under 26. (Sen. Bill No. 394 (2017–2018 Reg. Sess.); Stats. 2017, ch. 684, § 1.5.) Still excluded are offenders who were sentenced to life without parole for crimes committed after the age of 18 and, among others, offenders sentenced under the Three Strikes or One Strike laws. (§ 3051, subd. (h).)

Later that year, in *Contreras*, *supra*, 4 Cal.5th 349, the California Supreme Court considered whether sentences of 50 and 58 years to life imposed on juvenile nonhomicide offenders violate the Eighth Amendment. The defendants were subject to the One Strike law and were therefore not eligible for youth offender parole hearings under section 3051. (*Contreras*, at p. 359.) The court focused on the *Graham* requirements that the state must give juvenile nonhomicide offenders " 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' [Citation.]" (*Id.* at p. 367.)

The *Contreras* court thus addressed the Eighth Amendment question based on the nature of the *Graham* court's concerns. The court summarized *Graham* as requiring that a lawful sentence "recognize 'a juvenile nonhomicide offender's capacity for change and limited moral culpability' "; "offer 'hope of restoration' "; offer " 'a chance to demonstrate maturity and reform' "; provide a " 'chance for fulfillment outside prison walls,' and a 'chance for reconciliation with society' "; offer " 'the opportunity to achieve maturity of judgment and self-recognition of human worth and potential' "; and offer "the juvenile offender an 'incentive to become a responsible individual.' [Citation.]" (*Contreras*, *supra*, 4 Cal.5th at p. 367.)

8

Using those concerns as a guide, the *Contreras* court concluded a sentence of 50 years to life is functionally equivalent to life without parole for a juvenile nonhomicide offender because it does not offer the chances and opportunities *Graham* requires. (*Contreras*, *supra*, 4 Cal.5th at pp. 364, 368–369.) The court reasoned that *Graham* "envisioned more than the mere act of release or a de minimis quantum of time outside of prison. . . . Confinement with no possibility of release until age 66 or age 74 seems unlikely to allow for the reintegration that *Graham* contemplates." (*Id*. at p. 368.)

Our high court's next decisions regarding the punishment of juvenile and youth offenders and constitutional issues concerned the right to equal protection. In *Hardin*, *supra*, 15 Cal.5th 834, the court considered whether section 3051's exclusion of young adult offenders sentenced to life without parole violates the Fourteenth Amendment's equal protection guarantee. (*Hardin*, at pp. 838–839.)

The defendant in *Hardin* specifically challenged the life without parole exclusion as it applied to young adult offenders convicted of first degree special circumstance murder. (*Hardin*, *supra*, 15 Cal.5th at p. 847.) The court's analysis was therefore largely concerned with whether the Legislature had a rational basis to distinguish between young adults convicted of first degree murder with and without special circumstances. (See *id*. at pp. 859–863.) The court found there was a rational basis for the exclusion. (*Id*. at p. 840.)

However, as particularly relevant here, the *Hardin* court also rejected the defendant's argument based on the functional equivalence of sentences. A young adult offender sentenced to a term of years that exceeds natural life expectancy may be eligible

9

for a youth offender parole hearing, while a life without parole young adult offender is not.  Hardin argued this disparity demonstrated the irrational nature of the life without parole exclusion for reasons of culpability.  (*Hardin, supra,* 15 Cal.5th at p. 841.)

The court explained: "Hardin notes that we have described an aggregate sentence that fixes parole eligibility outside of an offender's life expectancy as the 'functional equivalent of a life without parole sentence.' [Citation.]  But we have employed that description in the context of identifying the category of juvenile offenders to whom the Eighth Amendment limitations on life without parole sentences apply; for that purpose, what matters is only whether the sentence, by its nature, forecloses any realistic chance for a juvenile offender to rejoin society.  [Citation.]  We have not held that a lengthy term-of-years sentence is necessarily equivalent to a life without parole sentence for all purposes." (*Hardin, supra,* 15 Cal.5th at p. 863.)

A few months later, in *People v. Williams* (2024) 17 Cal.5th 99 (*Williams*), the court considered an equal protection challenge to section 3051's exclusion of youth offenders sentenced under the One Strike law.  The defendant argued there was no rational basis to exclude One Strike, nonhomicide offenders, while including youth offenders convicted of murder without special circumstances.  (*Williams,* at p. 121.)  The defendant relied in part on the *Graham* court's statement that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers" (*Graham, supra,* 560 U.S. at p. 69; *Williams,* at p. 121), as well as scientific research

suggesting the *Roper*, *Graham*, and *Miller* principles are equally applicable to young adults up to age 25.  (*Williams*, at p. 126.)

The *Williams* court found a rational basis existed for the Legislature to distinguish between One Strike youth offenders and other youth offenders.  The court rejected the defendant's argument based on the *Graham* court's reasoning that murder is "not only fundamentally different 'in a moral sense' from other serious offenses, but also incomparable in terms of its ' " 'severity and irrevocability.' " ' [Citation.]"  (*Williams*, *supra*, 17 Cal.5th at pp. 130–131.)

The *Williams* court explained: "This argument based on the comparative seriousness of crimes, however, is premised on concerns relevant in the context of Eighth Amendment challenges to the death penalty and other severe criminal penalties, such as juvenile LWOP; such concerns do not necessarily establish whether a Legislature's classification violates equal protection under a rational basis standard.  We acknowledge that section 3051 was crafted to 'bring juvenile sentencing in conformity with *Miller*, *Graham* and *Caballero*' [citation], and to that end, Eighth Amendment 'protections outlined in *Miller*' are featured in this provision.  [Citation.]  However, despite 'language echoing the holdings of these cases' [citation], this equal protection analysis of section 3051 should not be conflated with principles governing the Eighth Amendment's prohibition against cruel and unusual punishment and its focus on punishment and proportionality in capital and juvenile LWOP sentencing."  (*Williams*, *supra*, 17 Cal.5th at p. 131.)

The court later "emphasize[d] that, in contrast to a cruel and unusual punishment analysis, the equal protection inquiry asks whether there is a rational basis for the Legislature to treat

11

certain individuals differently when prescribing the consequences under an ameliorative statute like section 3051. 'The Equal Protection Clause confers no substantive rights and creates no substantive liberties. The function of the Equal Protection Clause, rather, is simply to measure the validity of classifications created by state laws.' [Citation.] And, as we have explained above, the Legislature had a rational reason to categorically exclude young adult One Strike offenders, but not young adults convicted of non-special-circumstance murder, from early parole consideration under section 3051." (*Williams*, *supra*, 17 Cal.5th at p. 133.)

**II.**     *Heard*, *Sorto*, **and** *Munoz*

In 2022, the appellate court in *Heard* considered whether a juvenile homicide offender sentenced to 23 years plus 80 years to life was eligible for relief under section 1170(d). The court concluded the statute limits eligibility to juvenile offenders sentenced to actual life without parole and excludes those sentenced to functionally equivalent life without parole sentences. (*Heard*, *supra*, 83 Cal.App.5th at pp. 625–626.) However, the court held that denying a juvenile offender sentenced to the "functional equivalent" of life without parole the opportunity to petition for relief under section 1170(d) violates the constitutional guarantee of equal protection. (*Heard*, at p. 626.)

The *Heard* court first concluded the defendant was similarly situated with eligible juvenile offenders. The court did not discuss *Contreras* or consider whether there were differences between a lengthy term of years and life without parole. Instead, citing *Caballero*, the court simply noted that at the time the defendant was sentenced, he would have had to serve 103 years

12

before becoming parole eligible. (*Heard, supra,* 83 Cal.App.5th at p. 629.)

The *Heard* court then concluded there was no rational basis for section 1170(d) to distinguish between life terms that were the functional equivalent of life without parole and life without parole. The court rejected the People's sole justification for the differential treatment, which was the possibility that the Legislature concluded " 'that the punishment of [life without parole] imposed on those under age 18 could be excessive and this was an appropriate means of reform by allowing for reconsideration of such a sentence.' " (*Heard, supra,* 83 Cal.App.5th at p. 632; see *id.* at pp. 632–633.) The *Heard* court reasoned that "the same concern applies equally to juveniles sentenced to the functional equivalent of life without parole." (*Id.* at p. 632.)

Two years later, in *People v. Sorto* (2024) 104 Cal.App.5th 435 (*Sorto*), this court considered the same question that was presented in *Heard.* The defendant was a juvenile homicide offender sentenced to 10 years plus 130 years to life. (*Id.* at p. 440.) We rejected arguments that *Heard* was inconsistent with *Hardin* and *Franklin*.[3] (*Sorto,* at pp. 446–447.)

---

[3] The *Heard* court rejected the argument that, under the reasoning of *Franklin*, section 3051 had reformed the defendant's sentence so that it was no longer the functional equivalent of life without parole, rendering him ineligible for relief under section 1170(d). (*Heard, supra,* 83 Cal.App.5th at p. 628.) While this appeal was pending, the court in *People v. Ortega* (2025) 111 Cal.App.5th 1252, disagreed with the reasoning in *Heard* and concluded a juvenile offender's sentence of 25 years to life, plus 17 years, is not the functional equivalent of life without parole

13

We also found there was no rational basis to deny section 1170(d) relief to "functionally equivalent LWOP offenders," while providing it to juvenile offenders sentenced to express life without parole. (*Sorto, supra*, 104 Cal.App.5th at p. 450.) We reasoned that "[b]y definition, a functionally equivalent LWOP sentence includes a parole eligibility date that falls outside the offender's natural life expectancy." (*Id.* at p. 451.) We rejected the Attorney General's arguments that the Legislature could distinguish between the two groups based on the legislation being a response to *Graham*; moral principles; empirical facts; fiscal concerns; and relative culpability. (*Id.* at pp. 450–454.) Like the *Heard* court, we did not consider or rely on the *Contreras* discussion of functional equivalence.

In *People v. Bagsby* (2024) 106 Cal.App.5th 1040, the court that decided *Heard* reaffirmed that decision when considering a juvenile homicide offender's sentence of 107 years to life.

Finally, in *People v. Munoz* (2025) 110 Cal.App.5th 499, review granted June 25, 2025, S290828 (*Munoz*), our colleagues in Division Seven of this appellate district considered the very issue presented in the case at bar. The defendant, a juvenile homicide offender sentenced to 50 years to life, asserted his sentence was a de facto sentence of life without parole, and he was therefore entitled to section 1170(d) relief. (*Munoz*, at pp. 502–503.) A majority of the court concluded the sentence of 50 years to life was not the functional equivalent of life without parole. (*Id.* at p. 503.)

---

because it has been reformed by section 3051. However, this court previously considered the same issue in *Sorto*, and we agreed with the *Heard* court's reasoning. (*Sorto, supra*, 104 Cal.App.5th at pp. 447–448.)

The *Munoz* majority distinguished *Heard*, *Sorto*, *Bagsby*, and *People v. Mendez* (2010) 188 Cal.App.4th 47, because those cases "involved sentences with minimum parole eligibility dates much greater than 50 years. . . . Munoz's sentence is quantitatively different from the sentences in those cases." (*Munoz*, *supra*, 110 Cal.App.5th at pp. 507–508, review granted.) Further, unlike the defendant in *Caballero*, "Munoz will be 65 years old when he becomes eligible for parole (putting aside any hearing he may receive under § 3051) and will have a realistic opportunity to obtain release from prison during his expected lifetime." (*Id*. at p. 508.)

Although Munoz, amicus curiae, and the dissent relied on studies, publications, and reports to argue that the 50-years-to-life sentence would mean Munoz is likely to die in prison before reaching his parole eligibility date, the majority declined to consider those sources. Munoz had not presented them in the trial court and the court, citing *Hardin*, reasoned it could not evaluate their untested validity. (*Munoz*, *supra*, 110 Cal.App.5th at p. 508, review granted.) The majority further reasoned that "sift[ing] through studies and research" and making "policy decisions" is typically a legislative function, as is assessing potential solutions to "criminological problems" and "drawing lines." (*Id*. at pp. 509, 510.) "In enacting § 1170, subd. (d), the Legislature drew a line at life without the possibility of parole; it can draw other lines if it wants to." (*Id*. at p. 510.)

The *Munoz* majority further determined *Contreras* did not require a different result. The court noted the *Contreras* defendants were not homicide offenders, "which was an integral part of the Supreme Court's analysis." (*Munoz*, *supra*, 110 Cal.App.5th at p. 510, review granted.) Further, *Contreras*

15

considered only whether the sentences violated the Eighth Amendment.

In contrast, the dissent concluded the reasoning of *Contreras* "must inform" the decision of whether a 50-years-to-life sentence is the functional equivalent of life without parole for equal protection purposes, since section 1170(d) "was enacted in response to the principles articulated in [*Graham*]—the decision at the heart of *Contreras*." (*Munoz, supra*, 110 Cal.App.5th at p. 513, review granted (dis. opn. of Feuer, J.).) The dissent relied on statistics cited by Munoz regarding the average age of death of California inmates, and the higher mortality risk of children who suffer multiple adverse experiences, to conclude that a sentence of 50 years to life imposed on a 15- or 16-year-old "is the functional equivalent of an LWOP sentence because a substantial percentage of juvenile offenders will die in prison or be released at the end of their lifetimes, without a meaningful opportunity to become productive members of society." (*Id.* at p. 517, fn. omitted.)

The dissent found it not plausible that the Legislature "intended to limit resentencing relief to juvenile offenders who commit the most heinous crimes and would with certainty otherwise die in prison, and not to the substantial fraction of juvenile offenders sentenced to 50 years to life who also will die before they are eligible for release, or the fraction of juvenile offenders who, after serving most of their lifetimes in prison, will have no realistic opportunity to reintegrate into society or be incentivized to become responsible individuals." (*Munoz, supra*, 110 Cal.App.5th at p. 522, review granted (dis. opn. of Feuer, J.).)

16

## III. Section 1170(d) Does Not Violate Equal Protection Guarantees as Applied to Thompson

Thompson does not argue that his 50-years-to-life sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment as explained in *Miller*. Indeed, *Franklin* forecloses the argument. (*Franklin, supra*, 63 Cal.4th at pp. 279–280 [operation of § 3051 and other statutes means juvenile homicide offender's sentence of 50 years to life was neither LWOP nor its functional equivalent and any *Miller* challenge was moot].)

Instead, Thompson argues that the holdings in *Heard* and *Sorto* apply here and mandate that he be deemed eligible for section 1170(d) relief. In other words, Thompson argues that section 1170(d) violates his constitutional right to equal protection of the laws if he is excluded from its provisions. Thompson argues, and the People now concede, that because *Contreras* defined sentences of 50 years to life when imposed on a juvenile nonhomicide offender as the functional equivalent of life without parole, his sentence is also the functional equivalent of life without parole. And, because *Heard* and *Sorto* concluded the Legislature had no rational basis to distinguish between life without parole sentences and functionally equivalent life without parole sentences, that analysis applies to his sentence as well. He further urges us to adopt the reasoning of the *Munoz* dissent.

Neither *Heard*, nor this court in *Sorto*, applied the reasoning of *Contreras* to the equal protection challenges presented in those cases. We agree with the *Munoz* court that the *Contreras* notion of functional equivalence does not answer

17

the questions of eligibility for section 1170(d) relief presented here. (*Munoz*, *supra*, 110 Cal.App.5th at p. 511, review granted.)[4]

## A. *Contreras* and functional equivalence

In *Contreras*, the court explained that "[w]hen evaluating a sentence that clearly exceeds natural life expectancy, like the 110-year-to-life sentence in *Caballero*, it is straightforward to conclude that the sentence is 'functionally equivalent' to LWOP as an actuarial matter. [Citation.] But the issue of functional equivalence in this context is not limited to determining whether a term-of-years sentence is actuarially equivalent to LWOP."

---

[4] We also agree with the *Munoz* court that *Contreras* is distinguishable because the defendants in that case did not commit homicide. (*Munoz*, *supra*, 110 Cal.App.5th at pp. 510–511, review granted.) The *Contreras* court's reasoning is based on the categorical ban against life without parole for juvenile nonhomicide offenders and the conclusion that, pursuant to *Graham*, no sentence can be lawful for such offenders if it denies them a realistic opportunity to rejoin society. The *Contreras* court did not attempt to craft a version of functional equivalence to encompass what that term means for juvenile homicide offenders who *may* be sentenced to life without parole, and therefore denied an opportunity to rejoin society, if certain factors are considered at the time of sentencing. (See *Graham*, *supra*, 560 U.S. at pp. 69, 72, 74; *Miller*, *supra*, 567 U.S. at pp. 473, 479.) But even assuming that under the reasoning of *Contreras*, a sentence of 50 years to life imposed on a juvenile homicide offender violates the Eighth Amendment if imposed pursuant to a mandatory sentencing scheme because it is the "functional equivalent" of life without parole, we still disagree that the *Contreras* formulation of "functional equivalence" mandates the conclusion that section 1170(d) violates equal protection guarantees in denying relief to juvenile offenders sentenced to 50 years to life.

(*Contreras*, *supra*, 4 Cal.5th at p. 364.)

The court proceeded to describe an alternative form of "functional equivalence," based on the "separate and distinct question" of "whether a lengthy term-of-years sentence, though not clearly exceeding a juvenile offender's natural lifespan, may nonetheless impinge on the same substantive concerns that make the imposition of LWOP on juvenile nonhomicide offenders impermissible under the Eighth Amendment." (*Contreras*, *supra*, 4 Cal.5th at p. 364.)

The *Contreras* court then specified: "This latter notion of functional equivalence—that a term-of-years sentence may function like LWOP *with respect to the Eighth Amendment concerns that constrain lawful punishment for juvenile nonhomicide offenders*—is what we must address in this case." (*Contreras*, *supra*, 4 Cal.5th at p. 364, italics in original.)

We find this limitation important, particularly in light of the court's subsequent statements in *Hardin* and *Williams* rejecting attempts to collapse the separate Eighth and Fourteenth Amendment analyses into one. (*Williams*, *supra*, 17 Cal.5th at p. 131; *Hardin*, *supra*, 15 Cal.5th at p. 863.) We agree with Thompson that *Hardin* did not endorse the proposition that the "doctrine of functional equivalence" can never apply in the equal protection context. But we understand the *Hardin* and *Williams* courts to have meant what they said: Eighth Amendment concerns do not *necessarily* establish an equal protection violation, and an equal protection specific analysis is therefore necessary.

*Heard* and *Sorto* both employed a notion of functional equivalence consistent with *Caballero*: the sentences clearly exceeded natural life expectancy and were therefore functionally

19

equivalent to life without parole as an actuarial matter. But although Thompson argues the *Heard* equal protection analysis applies to this case, he also urges us to conclude, as in *Contreras*, that the issue of functional equivalence is not limited to determining whether a term-of-years sentence is actuarially equivalent to life without parole. Yet, the "context" before us is different from the one in *Contreras*. (*Contreras*, *supra*, 4 Cal.5th at p. 364.)

The Eighth Amendment analysis demands an answer to the question: "[R]eferring to 'the evolving standards of decency that mark the progress of a maturing society,' " is a punishment "so disproportionate as to be cruel and unusual[?]" (*Roper*, *supra*, 543 U.S. at p. 561.) "In accordance with the constitutional design, 'the task of interpreting the Eighth Amendment remains [the court's] responsibility.' [Citation.] The judicial exercise of independent judgment requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question." (*Graham*, *supra*, 560 U.S. at p. 67.)

As noted above, Thompson does not argue that his sentence violates the Eighth Amendment. In asking us to apply the reasoning in *Heard*, he is contending that he has been denied his right to equal protection under the law. *Hardin* and *Williams* set forth the analysis required to evaluate an equal protection challenge when the law at issue does not involve a suspect classification or a fundamental right:[5]

"[W]hen plaintiffs challenge laws drawing distinctions between identifiable groups or classes of persons, on the basis

---

[5]     Thompson does not argue that his claims involve a suspect classification or a fundamental right.

that the distinctions drawn are inconsistent with equal protection, courts no longer need to ask at the threshold whether the two groups are similarly situated for purposes of the law in question.  The only pertinent inquiry is whether the challenged difference in treatment is adequately justified under the applicable standard of review.  The burden is on the party challenging the law to show that it is not." (*Hardin*, *supra*, 15 Cal.5th at pp. 850–851.)

" '[W]e presume that a given statutory classification is valid "until the challenger shows that no rational basis for the unequal treatment is reasonably conceivable."  [Citation.]  The underlying rationale for a statutory classification need not have been "ever actually articulated" by lawmakers, nor "be empirically substantiated."  [Citation.]  Evaluating potential justifications for disparate treatment, a court reviewing a statute under this standard must "treat the statute's potential logic and assumptions far more permissively than with other standards of constitutional or regulatory review."  [Citation.]  "If a plausible basis exists for the disparity, courts may not second-guess its ' "wisdom, fairness, or logic." ' ["]  [Citation.]  ["][T]he logic behind a potential justification need [not] be persuasive or sensible—rather than simply rational." [']  (*Hardin*, *supra*, 15 Cal.5th at p. 852.)  '[T]his high bar helps ensure that democratically enacted laws are not invalidated merely based on a court's cursory conclusion that a statute's tradeoffs seem unwise or unfair.' [Citation.]" (*Williams*, *supra*, 17 Cal.5th at p. 124.)

This was not the analysis conducted in *Contreras* because the court was presented with a different question.  The *Contreras* court's own description of the question it was deciding suggests its alternative functional equivalence analysis does not upend the

21

court's well-established framework for evaluating an equal protection claim. We disagree with Thompson's implicit argument that *Contreras* and *Caballero* created a single "functional equivalent" classification that transfers into the equal protection context and renders a sentence of 110 or 130 years to life indistinguishable from a sentence of 50 years to life. (*Munoz, supra*, 110 Cal.App.5th at p. 508, review granted [50-years-to-life sentence is less than half of the defendants' sentences in *Heard, Sorto*, and *Bagsby*, and is "quantitatively different from the sentences in those cases"].)

Instead of asking whether a 50-years-to-life term functions like life without parole with respect to Eighth Amendment concerns that constrain lawful punishment for juvenile nonhomicide offenders, we must ask whether " 'a statutory distinction [between life without parole and a 50-years-to-life term] is so devoid of even minimal rationality that it is unconstitutional as a matter of equal protection.' [Citation.]" (*Williams, supra*, 17 Cal.5th at p. 123; *Munoz, supra*, 110 Cal.App.5th at p. 510, review granted [the Legislature has responsibility for "evaluating potential solutions and drawing lines"].)

**B. Thompson has not shown there was no rational basis for the Legislature to treat juvenile offenders sentenced to 50 years to life differently from juvenile offenders sentenced to life without parole**

As we explained in *Sorto*, "[t]he Fourteenth Amendment to the United States Constitution and article 1, section 7 of the California Constitution prohibit the denial of equal protection of the laws. (U.S. Const., 14th Amend., § 1; Cal. Const., art. I, § 7,

22

subd. (a).)  'At core, the requirement of equal protection ensures that the government does not treat a group of people unequally without some justification.' [Citation.]  [¶] . . . [¶]  We independently review equal protection claims." (*Sorto, supra,* 104 Cal.App.5th at pp. 441, 442.)

"We find a denial of equal protection only if there is no *rational* relationship between a disparity in treatment and some legitimate government purpose." (*People v. Chatman* (2018) 4 Cal.5th 277, 288–289 (*Chatman*).)  Thompson contends the legislative purpose of section 1170(d) was to address the punishment deemed cruel and unusual in *Graham* and *Miller*, or, more broadly, to "address the cruelty of juvenile offenders' sentences."  He asserts the Attorney General failed to advance a rational basis for distinguishing between his sentence and life without parole for purposes of section 1170(d), and, further, that there could be no rational basis in light of Eighth Amendment case law holding both sentences are inhumane when imposed on juvenile offenders.

However, the legislative history of Senate Bill No. 9 indicates that while *Graham* violations and cruel or disproportionate sentences imposed on juveniles were the Legislature's general considerations in enacting section 1170(d), it was expressly concerned about juveniles being sentenced to *die* in prison.

For example, an Assembly Committee Appropriations analysis provided the following rationale for the legislation: "The authors and supporters contend sentencing minors to die in prison is barbaric, counter to principles of cognitive and emotional development in minors, and all but unprecedented in [the] rest of the world.  This bill, rather than prohibiting LWOP

23

for minors, simply authorizes a judicial process for reviewing and re-sentencing. Re-sentencing, should it occur, would result in a life sentence, but one with the possibility of parole, based on the evaluation of the Board of Parole Hearings. Offenders would still serve decades in prison." (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.) as amended Aug. 15, 2011, p. 2.) The same report additionally commented: "LWOP for minors violates international law, according to a 2007 report 'Sentencing Our Children to Die in Prison,' by the Center for Law and Global Justice and The Frank C. Newman International Human Rights Law Clinic at the University of San Francisco School of Law . . . ." (*Id*. at p. 4.)

The author of the bill provided background relating specifically to express life without parole sentences. This included statistics regarding racial disparities in the imposition of life without parole for juveniles. (See, e.g., Assem. Com. on Public Safety, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.) as amended May 27, 2011, p. 7 [" 'California has one of the worst records in the nation for racial disparity in the imposition of life without parole for juveniles. African American youth are sentenced to life without parole at over 18 times the rate of white youth. Hispanic youth are sentenced to life without parole five times more often than white youth.' "].) The background also discussed the nature of crimes that led to juvenile life without parole sentences, noting that a large percentage of juveniles sentenced to life without parole committed their crimes in a group or with an adult, or were convicted on a felony murder theory. (*Id*. at pp. 7–8.)

Several reports included statements from groups supporting the legislation, such as: " '[W]hen California

24

condemns a young person to a life behind bars, it utterly disregards the human capacity for rehabilitation . . . .  SB 9 would ensure that youth offenders would face severe punishment for their crimes, but they would have the chance to work toward parole . . . .' "; " 'Child offenders would still face severe punishment and lengthy prison terms for committing horrible crimes.  However, SB 9 would offer an opportunity for redemption' "; and " 'The United States is the only country in the world that imposes life without parole on youth under the age of 18 years old.  This extreme punishment is a violation of international law and fundamental human rights.' " (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 9, *supra*, as amended May 27, 2011, at p. 11.)

This history suggests the Legislature's concern was not merely excessive punishment of juveniles that failed to take into consideration their capacity for change, or even lengthy sentences.  Instead, a specific goal was to provide an opportunity for juvenile offenders whose sentences ensured they would die in prison.  Thompson has not established that the background facts or supporting statements described above would have applied equally to sentences of 50 years to life.  (*Hardin*, *supra*, 15 Cal.5th at p. 851 [the party challenging a law has the burden to demonstrate the challenged difference in treatment has no rational basis].)

The legislative history also establishes the Legislature's intent to proceed incrementally in addressing the larger problem of excessive punishment of juvenile offenders.  Fiscal reports indicated the law would only apply to 293 inmates in California. The anticipated fiscal impact of the legislation was calculated accordingly, considering both increased administrative costs and

potential future savings from reduced sentences.  (See, e.g., Sen. Appropriations Com. Fiscal Summary of Sen. Bill No. 9 (2011–2012 Reg. Sess.) as introduced.)

Consistent with the relatively small number of inmates the legislation was anticipated to cover, the bill was described as a " 'modest and narrowly focused piece of legislation.' " (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.) as amended Dec. 6, 2010, p. 11.)  Reports also noted the limited scope of underlying offenses, stating that "[o]nly a juvenile convicted of first-degree murder with special circumstances, as specified, may be sentenced to a term of LWOP." (*Id*. at p. 10; see, e.g., Assem. Com. on Public Safety, Analysis of Sen. Bill No. 9, *supra*, as amended May 27, 2011, p. 9.)

At the time of enactment, the Legislature could reasonably consider life without parole to be the most severe and unjust punishment imposed on juvenile offenders.  While both life without parole and 50-years-to-life sentences are now deemed unconstitutionally excessive punishment when imposed on juvenile offenders, the Legislature could rationally conclude that providing the relatively small number of juvenile offenders otherwise certain to die in prison an opportunity to obtain a lesser sentence was the most pressing priority.  "A desire to avoid condemning minors to die in prison is obviously a valid reason for the Legislature to grant relief to explicit LWOP offenders." (*Sorto*, *supra*, 104 Cal.App.5th at p. 451.)

Thompson argues that based on empirical data regarding the average age of death of incarcerated men and juveniles, the Legislature could not rationally distinguish between a sentence of life without parole and a sentence of 50 years to life, which, for

26

many juvenile offenders, would in fact result in their death in prison. He cites, for example, statistical data collected by the California Correctional Health Care System reporting that "male people died in custody, on average, at age 57 in 2016, at age 56 in 2017," "at age 55.9 in 2018, at age 65 in 2019, at age 60 in 2020, and at age 61 in 2021."

We note the data upon which Thompson relies were not presented to the trial court. We agree with the *Munoz* court that "we cannot evaluate their untested validity" and therefore have a basis to disregard them. (*Munoz*, *supra*, 110 Cal.App.5th at p. 508, review granted, citing *Hardin*, *supra*, 15 Cal.5th at p. 862 ["To strike down an act of the Legislature as irrational based on a set of untested empirical findings would be antithetical to multiple settled principles of judicial review."].)

Further, rational basis review is a deferential standard. As stated in *Williams*, " ' "[w]hen conducting rational basis review, we must accept any gross generalizations and rough accommodations that the Legislature seems to have made." [Citation.] "A classification is not arbitrary or irrational simply because there is an ' "imperfect fit between means and ends" ' [citations], or 'because it may be "to some extent both underinclusive and overinclusive." ' " ' [Citation.]" (*Williams*, *supra*, 17 Cal.5th at pp. 124–125.) Here, Thompson fails to show that the line distinguishing life without parole from 50 years to life is irrational, even when considered in an actuarial sense.

Even if the statistics Thompson asks us to consider are credited, it remains the case that, before section 3051 reformed many sentences, as between juvenile offenders sentenced to 50 years to life and those sentenced to life without parole, only the latter category had a 100 percent chance of dying in prison. This

27

was a distinction the Legislature could rationally take into account. To address the overly harsh and unjust punishment of juvenile offenders, even if that punishment was lawfully imposed, the Legislature was "entitled to proceed incrementally, so long as it proceeds rationally, in 'walking [the] tightrope' of the political process." (*Hardin*, *supra*, 15 Cal.5th at p. 866.) " 'Far from having to "solve all related ills at once" [citation], the Legislature has "broad discretion" to proceed in an incremental and uneven manner without necessarily engaging in arbitrary and unlawful discrimination.' [Citation.]" (*Williams*, *supra*, 17 Cal.5th at p. 125.)

Thompson also relies on the empirical data to assert that the equal protection violation arises because both juvenile offenders serving a sentence of 50 years to life and those serving life without parole are equally deprived of a meaningful opportunity to rejoin society. Thompson argues that if the Legislature's intent was "to address the cruelty of juvenile offender's sentences, it is irrational to distinguish between the two groups given the plethora of case law identifying how LWOP sentences and de facto LWOP sentences for juvenile offenders present the same problems regarding the inhumanity of imposing such sentences on minors as they equally deprive juvenile offenders with the possibility of release."

This argument essentially posits that it was not rational for the Legislature to address the excessive punishment of juvenile offenders without providing relief that mirrors the courts' holdings defining what is unconstitutional punishment. If the Legislature's sole purpose was to rectify unconstitutional excessive punishment as defined by *Graham*, *Miller*, and future courts, Thompson's argument might be persuasive. But

28

Thompson himself asserts that the purpose of section 1170(d) "is distinct from the intention to address any constitutional errors (*Kirchner*) . . . ."

In *Sorto*, we explained that section 1170(d) does not closely track *Graham* and, in fact, extends relief to more offenders—namely juvenile homicide offenders—than would have been necessary to just address *Graham*. And, as Thompson acknowledges, in *Kirchner*, the court concluded section 1170(d) was not designed to provide a remedy for *Miller* error and did not necessarily address all *Miller* problems. (*Kirchner*, *supra*, 2 Cal.5th at pp. 1054–1055.) The Legislature responded to *Graham*, *Miller*, and *Caballero* by enacting section 3051, and by amending section 3051 to be more expansive, not by amending section 1170(d). (Cf. § 1170, subd. (d)(13); Stats. 2016, ch. 867, § 1; Sen. Bill No. 1084 (2015–2016 Reg. Sess.) [§ 1170(d) does not abrogate rights or remedies otherwise available to the defendant].) Thompson has not shown that the Legislature's decision to address one aspect of the problem of the punishment of juvenile offenders in section 1170(d) (i.e., death in prison), was irrational because it did not also remedy other ways in which courts have found juvenile punishment invalid (i.e., no meaningful opportunity to rejoin society).

Thompson also contends it was irrational for the Legislature to extend section 1170(d) relief to more serious offenders while excluding less serious offenders. However, courts have found rational legislative schemes with similar effects. For example, in *In re Spencer S.* (2009) 176 Cal.App.4th 1315 (*Spencer*), a minor misdemeanant argued a law authorizing deferred entry of judgment for first-time juvenile felons, while denying the same relief to first-time juvenile misdemeanants,

29

violated equal protection guarantees.  (*Id*. at p. 1324.)  The minor contended that because the purpose of the law was to advance the rehabilitation of minors while protecting the public from more dangerous ones, provisions of the law giving " 'preference to felons over misdemeanants in rehabilitative-related benefits' " could not survive a rational basis analysis.  (*Id*. at p. 1325; see *id*. at pp. 1325–1326.)

The reviewing court disagreed.  The court reasoned that in an effort to forestall an anticipated increase in juvenile crime with scarce resources, voters "rationally selected the class of first-time nonviolent juvenile felons as the juvenile offenders most at risk of being swept up into the criminal wave and yet who retained the potential to be reformed."  (*Spencer*, *supra*, 176 Cal.App.4th at pp. 1327–1328.)  The court further explained that the law was enacted following a prior law's "tougher treatment" of juvenile felons specifically.  The "law's benefits were rationally restricted to juvenile felons because of the severe consequences otherwise applicable to them."  (*Id*. at p. 1328.)

Similar reasoning applies here.  It is too broad to say that the Legislature wanted to provide a remedy for all disproportionate punishment imposed on juveniles, or simply to provide an opportunity for rehabilitation of juvenile offenders.  The legislative history indicates that one purpose of section 1170(d) was to address the *greatest* mismatch between culpability and punishment, and to address the *most* severe and barbaric punishments imposed on juvenile offenders.  The Legislature could therefore rationally restrict relief to juvenile offenders sentenced to life without parole because of the most severe consequences they faced, despite the possibility that they

30

committed crimes more egregious than juvenile offenders serving lesser sentences, such as 50 years to life.

Further, courts have concluded the Legislature may rationally provide a rehabilitative benefit to a group of offenders who committed more serious crimes, while excluding those convicted of lesser crimes, when the less culpable group may have other avenues for relief.  (*Chatman*, *supra*, 4 Cal.5th at pp. 294–295; *Spencer*, *supra*, 176 Cal.App.4th at p. 1329.)  The Legislature could have made that choice here.

For example, juvenile offenders sentenced to 50 years to life might accrue conduct credits while in prison that would meaningfully shorten their sentences, while a life without parole sentence could not be modified by credits, even if accrued.  (See Cal. Code Regs., tit. 15, § 3043.2, subd. (b)(1) [provision for credits to persons sentenced to life with the possibility of parole; no good conduct credit shall be awarded to person sentenced to life without possibility of parole]; cf. § 2933.2, subd. (a) [persons convicted of murder shall not accrue credit specified in §§ 2933, 2933.05].)  Indeed, even though the Legislature enacted section 3051 the same year section 1170, former subdivision (d)(2) became effective, immediately providing Thompson the chance at parole in his 25th year of incarceration, the original version of section 3051 did not modify the sentences of juvenile offenders sentenced to life without parole.

Likewise, the Legislature could rationally distinguish between life without parole and 50-years-to-life sentences based on differing prison conditions of the two groups.  That "it is the policy in some prisons to withhold counseling, education, and rehabilitation programs for those who are ineligible for parole consideration" (*Graham*, *supra*, 560 U.S. at p. 79), would provide

31

the Legislature with reason to give life without parole juvenile offenders in particular an opportunity to be resentenced to a life with parole sentence. The Legislature could rationally presume that an offender serving 50 years to life would already have been able to participate in such programs. "Equal protection 'does not prohibit the Legislature from regulating certain classes of cases in which the need is deemed most evident.' [Citations.]" (*Williams*, *supra*, 17 Cal.5th at p. 135.)

We note that the Legislature's line-drawing authority and ability to proceed incrementally has been recognized in numerous contexts, not limited to punishing relative culpability more severely, or to prescribing disparate punishments for different offenses. (See, e.g., *Chatman*, *supra*, 4 Cal.5th at p. 283 [statute authorizing certificates of rehabilitation for former probationers based on different, more stringent eligibility criteria than those faced by former prisoners was sufficiently rational line drawing].)

Further, although *Hardin* and *Williams* considered exclusions from section 3501 based on underlying offenses and related to young adult offenders rather than juveniles, we find those courts' explanation of general equal protection principles regarding line drawing and incremental legislation still applicable here, where the Legislature endeavored to provide relief to a particularly at risk group. (*Warden v. State Bar* (1999) 21 Cal.4th 628, 644–645, citing *Williamson v. Lee Optical of Oklahoma Inc.* (1955) 348 U.S. 483, 489 [" 'Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. [Citation.] Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.' "].)

Like the *Munoz* court, we acknowledge that "tough questions" remain regarding sentences not before us (*Munoz, supra*, 110 Cal.App.5th at p. 510, review granted), and potentially implicating the "tangle of legal and empirical difficulties" the *Contreras* court identified (*Contreras, supra*, 4 Cal.5th at p. 361), unless and until the Legislature takes further action to amend section 1170(d) to account for the eligibility of juvenile offenders who were sentenced to the "functional equivalent" of life without parole. However, our review is of necessity limited to the questions posed in this case and the record properly before us.

As noted above, the California Supreme Court has explained that an equal protection challenge "concerns only the constitutional permissibility of the lines the Legislature has drawn. It is not for us to pass judgment on the wisdom or desirability of its policy choices." (*Hardin, supra*, 15 Cal.5th at p. 864.) " 'If a plausible basis exists for the disparity [in treatment of different groups,] courts may not second-guess its " 'wisdom, fairness, or logic.' " ' [Citation.] '[T]he logic behind a potential justification need [not] be persuasive or sensible—rather than simply rational.' " (*Id.* at p. 852.) Thompson fails to demonstrate that the life without parole limitation on eligibility for section 1170(d) relief has no rational basis, and is therefore unconstitutional, as applied to juvenile homicide offenders who were sentenced to serve 50 years to life.

**DISPOSITION**

The trial court order is affirmed.

**CERTIFIED FOR PUBLICATION**

ADAMS, J.

We concur:

EDMON, P. J.

EGERTON, J.